UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

PAUL FINNEY, *et al.*                                                    PLAINTIFFS


v.                                               CIVIL ACTION NO. 3:08-CV-00383


THE FREE ENTERPRISE SYSTEM, INC.
& SODREL TRUCK LINES, INC.                                           DEFENDANTS

### MEMORANDUM OPINION

In a complaint filed July 21, 2008, the plaintiffs brought claims against the defendants under

the Fair Labor Standards Act of 1938 ("FLSA") and the Kentucky wage and hour laws. The

defendants have now moved for summary judgment on those claims (DN 106). For the reasons

stated herein, the summary judgment motion will be granted in part and denied in part.

### I.

The plaintiffs in this case are current and former employees of defendant The Free

Enterprise System, Inc. ("FES"). The plaintiffs were all drivers of shuttles operated by FES at

the United Parcel Service's ("UPS") Worldport facility in Louisville, Kentucky. Both FES and

Sodrel are part of the "Sodrel Transportation Group" and they share headquarters, maintenance

and garage space, information systems, corporate officers, and employees.

FES has terminals in Jeffersonville and Indianapolis, Indiana; Lexington, Kentucky; and

Lansing, Illinois. The majority of FES's business consists of operating interstate passenger

charter bus trips; the motor coaches used for those trips can hold approximately 54 passengers

each. Additionally, FES operates smaller "shuttle," "sprinter," and "trolley" buses that travel to

locations in Indiana and Kentucky for weddings, corporate events, sporting events, conventions, and other private functions. FES has had an Interstate Commerce Commission/U.S. Department of Transportation ("DOT") motor carrier number since 1983, and its interstate vehicles are all registered with the DOT. In order to drive the larger motor coaches or any of the smaller shuttle, sprinter, or trolley buses, drivers were required to have a Commercial Drivers License ("CDL") with a passenger endorsement and, depending on the vehicle, an air brake endorsement.

In addition to the portions of its business listed above, until 2010, FES contracted with UPS, an international and interstate package delivery company, to provide a shuttle service at the UPS Worldport facility in Louisville, Kentucky. The Worldport contained UPS's airport facilities and a packaging handling center. Thousands of UPS employees, who are from Kentucky and Indiana, work at the Worldport. In addition, UPS pilots and other personnel fly to locations around the world from the Worldport.

The shuttle service provided by FES at the Worldport complex was a "24-7" service that ran on a two-mile loop within the Worldport. The shuttle trams consisted of one "power car" and up to two "trailer" units. Each power car and trailer unit held approximately 40 passengers each. To drive a shuttle tram, a driver was not required to obtain a CDL. According to the affidavit of Ed Moore, who was the Contract Supervisor of the Worldport shuttle service, UPS also occasionally "required FES to bring its pilots from the Worldport to nearby hotels, and to take UPS employees from the Worldport to a controlled access point at the Worldport's air freight terminal." It is unclear whether the shuttle drivers were the ones who were tasked with those responsibilities.

After FES hired a person to work at the Worldport facility as a shuttle driver, the person would undergo training at the Worldport on how to drive the shuttle trams. FES also separately provided training at its Jeffersonville, Indiana headquarters for new employees to obtain CDLs. The CDL training focused on how to drive a charter bus. Through that training, several plaintiffs ultimately passed the test required to receive a CDL. For many of those drivers, several months passed between the time they were hired and the time the received their CDLs; in the case of one plaintiff, it was over two years between his hire date and the date he received a CDL. A handful of other plaintiffs already had a CDL when FES hired them. One plaintiff, Theodore Jackson, never obtained a CDL, although he did receive a certificate from FES certifying that he had completed the training requirements set forth in the FMCSRs for entry-level driver training.

FES states that it required compliance with the DOT's Federal Motor Carrier Safety Regulations ("FMCSRs") by all drivers and other applicable employees. The DOT regularly audits the driver files kept by the companies, including the Worldport shuttle drivers. In a May 2009 audit, DOT found that of 98 total drivers employed by FES, 98 of them were interstate drivers with Commercial Drivers Licenses ("CDLs"). Because the audit suggested a few areas of improvement, FES sent a memo to all of its drivers, including shuttle drivers, emphasizing compliance with DOT regulations.

Generally speaking, FES used a "bid" system to distribute jobs. FES would post the bid, stating a particular "run time" for each day of work associated with that bid. The most senior driver that signed up for that bid would be awarded the work.[1] FES instructed shuttle tram

---

[1] An example bid sheet provided by the plaintiffs is illustrative. That bid sheet was denoted "UPS BID #7" and provided that for two weeks, the driver that was awarded that bid–in this case, Finney–would work Monday through Friday from 10:00 p.m. until 6:00 a.m.

drivers to arrive for shifts one-half hour early for a pre-trip shuttle inspection. Then, during the run time, drivers were permitted two paid breaks and a 30-minute unpaid meal break. According to FES, taking into account that the shuttle drivers arrived to work 30 minutes prior to their "run time," but had a 30 minute unpaid meal break during their "run time," the compensable hours that the shuttle drivers worked was equal to their "run time."[2] Shuttle drivers recorded the hours they worked on time cards provided by FES, which the drivers were required to sign. A supervisor at FES compared the drivers' time cards to their scheduled hours and investigated any significant variances. The drivers were paid a "straight hourly wage" for the time they worked; they did not receive one and one-half times their hourly wage for overtime hours.

Plaintiffs Paul Finney and Chelsea Pellman filed a complaint against FES and Sodrel on behalf of themselves and all others similarly situated, claiming that the defendants violated sections 206 and 207 of the FLSA and the Kentucky wage and hour laws by failing to pay wages for hours worked and failing to pay overtime wages. The plaintiffs then moved for court-supervised notice to putative collective action members pursuant to the FLSA. This court conditionally granted the plaintiffs' motion. Sixteen plaintiffs, in addition to Finney and Pellman returned the consent forms to join the collective action. The court has since entered agreed orders dismissing the claims of four plaintiffs; fourteen plaintiffs remain.

---

[2] FES provides as an example a driver who was scheduled to work a "run time" from 6:00 a.m. until 2:00 p.m., eight hours. Under that example, the driver would arrive at the Worldport at 5:30 a.m. and would work until 2:00 p.m., or eight and one-half hours. However, in the midst of that eight and one-half hours would be a one-half hour unpaid meal break, such that the total compensable time was eight hours, or the same as the number of hours in the driver's "run time."

## II.

To prevail on a motion for summary judgment, the movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact arises when there is sufficient evidence on which the jury could reasonably find for the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1985). The disputed issue need not be resolved conclusively in favor of the non-moving party, but that party must present sufficient probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-289 (1968). The evidence must be construed in the light most favorable to the non-moving party. *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004).

## III.

As noted above, the plaintiffs contend that the defendants violated the FLSA and the Kentucky wage and hour laws by not paying them overtime wages. "The FLSA establishes a general rule that requires employers to compensate any employee 'at a rate not less than one and one-half times the regular rate at which he is employed' for the time worked in excess of 40 hours per week." *Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 903-904 (6th Cir. 2002) (quoting 29 U.S.C. § 207(a)(1)). The Kentucky wage and hour laws imposes the same overtime pay requirement upon employers. KRS § 337.285. However, both the FLSA and the Kentucky wage and hour laws carve out various exemptions to the overtime pay requirement. The defendants argue that two exemptions to the FLSA–the Motor Carrier Act Exemption and the Air Carrier Exemption–apply here. "The exemptions to the FLSA's overtime provisions are to be

narrowly construed against the employers seeking to assert them," and the employer bears the burden of proof as to the applicability of the exemption. *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 578 (6th Cir. 2004) (internal quotation marks omitted).

## A. The Motor Carrier Act Exemption

Under the FLSA and the Kentucky wage and hour laws, the overtime pay requirements are not applicable to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1); KRS § 337.285(2)(c). Relevant here, the Motor Carrier Act provides the Secretary of Transportation with the power to regulate employees who work for motor carriers that provide transportation in interstate commerce. *Vaughn*, 291 F.3d at 904; 49 U.S.C. §§ 31502, 13501.

The Department of Labor's regulation implementing the Motor Carrier Act exemption of the FLSA states that the "exemption of an employee . . . depends both on the class to which his employer belongs and on the class of work involved in the employee's job." 29 C.F.R. § 782.2(a). The regulation provides two requirements for determining whether a class of employees is subject to the exemption. Specifically, the class of employees must: 1) be "employed by carriers whose transportation of passengers or property by motor vehicle is subject to [the Secretary of Transportation's] jurisdiction under section 204 of the Motor Carrier Act"; and 2) "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." *Id.*; *Benson v. Universal Ambulance Serv., Inc.*, 675 F.2d 783, 785 (1982).

The plaintiffs concede that the defendants meet the first requirement of the regulation, i.e. that the defendants are motor carriers that are subject to the Secretary of Transportation's jurisdiction (DN 114 at 15). As the plaintiffs note, the defendants are regulated by the DOT and hold themselves out as carriers in interstate commerce (*id.*). Accordingly, the court will not dwell on this point. Nor do the plaintiffs contest that, as drivers of motor vehicles, they were engaged in an activity that directly affected the safety of operation of motor vehicles. A Department of Labor regulation provides that "[t]he work of an employee who is a full-duty or partial-duty 'driver' . . . directly affects 'safety of operation' within the meaning of section 204 of the Motor Carrier Act whenever he drives a motor vehicle in interstate or foreign commerce within the meaning of that act." 29 C.F.R. § 782.3(b).

Thus, the court turns to the sole disputed issue as it relates to the Motor Carrier Act exemption: whether the plaintiffs' activities were sufficiently related to interstate commerce. The defendants put forth two theories as to that issue. First, the defendants argue that the plaintiffs could reasonably have been expected to drive in interstate commerce as part of their work for FES. Second, the defendants contend that the plaintiffs' shuttle driving was done as part of the "practical continuity of movement" in interstate commerce.

### 1. The Reasonable Expectation of Interstate Driving Test

In *Morris v. McComb*, 332 U.S. 422 (1947), the Supreme Court confronted the question of whether a group of drivers were subject to regulation by the Secretary of Transportation under the Motor Carrier Act. Only 3.65% of the drivers' trips were devoted to interstate commerce; the rest of the time, the drivers were involved in commerce wholly within the state of Michigan. *Morris*, 332 U.S. at 433. The interstate commerce trips were "distributed generally throughout

- 7 -

the year and their performance was shared indiscriminately by the drivers and was mingled with the performance of other like driving services rendered by them otherwise than in interstate commerce." *Id.* The trips were "a natural, integral and apparently inseparable part of the common carrier service." *Id.* Among the 43 drivers, 41 of them made a trip in interstate commerce; the two who did not were only employed for the half of the year when the interstate trips were less frequent. *Id.* The average driver had driven 16 trips in interstate commerce. *Id.* The Supreme Court found that, by virtue of their driving in interstate commerce, the drivers were subject to regulation by the DOT. *Id.* at 434.

The Department of Labor's regulation concerning the Motor Carrier Act exemption states that "if the bona fide duties of the job performed by the employee are in fact such that he is (or, in the case of a member of a group of drivers, . . . that he is likely to be) called upon in the ordinary course of his work to perform, either regularly or from time to time," interstate driving, he comes within the exemption "in all workweeks when he is employed at such job." 29 C.F.R. 782.2(b)(3). In addition, the Federal Highway Administration has issued a Notice of Interpretation concerning the scope of jurisdiction of the DOT to regulate drivers under the Motor  Carrier Act. 46 Fed. Reg. 37,902 (July 23, 1981). The Notice of Interpretation reviewed cases from various federal courts, including *Morris*, and stated that the "cases establish that a driver will remain under the jurisdiction of [the Motor Carrier Act] for as long as the driver is in a position to be called upon to drive in interstate commerce as part of the driver's regular duties." *Id.* at 37,902-37,903. What the case law "left unanswered" was "how to determine whether a driver is in that position." *Id.* at 37,903. The Notice of Interpretation stated that the Federal Highway Administration's view was as follows:

"[i]f jurisdiction is claimed over a driver who has not driven in interstate commerce, evidence must be presented that the carrier has engaged in interstate commerce and that the driver could reasonably have been expected to make one of the carrier's interstate runs. Satisfactory evidence would be statements from drivers and carriers, and any employment agreements.

*Id.*

Here, the defendants argue that the evidence is sufficient to conclusively show that the plaintiffs could reasonably have been expected to drive in interstate commerce. In support, the defendants point that the DOT has regularly audited FES and, most recently, classified all of FES's drivers as interstate/CDL drivers. The defendants continue that FES requires strict compliance by the plaintiffs with the FMCSRs, and FES provided training and testing for the shuttle drivers to obtain a CDL. Additionally, the defendants point out that FES has historically operated a charter bus company, that it holds itself out as an interstate motor carrier, and that the Worldport shuttle service was "developed as an offshoot of the successful primary charter business." The defendants also state that the plaintiffs were informed "through initial employment paperwork and 'bid' offer sheets that they were subject to DOT regulation" and that a condition of their employment was that they were "subject to driving whatever route or vehicle" the company needed them to drive, including "interstate charter bus routes and other routes by the DOT." According to the defendants, "FES reserved the right to terminate their employment if they refused." Finally, the defendants note that "[m]any shuttle drivers drove motor coaches on interstate charter trips, including several of the Plaintiffs"; additionally, some plaintiffs drove commercial vehicle trips between Indiana and Kentucky for weddings and other events and for maintenance functions. Defendants state that they "assigned these trips

indiscriminately, taking driver preference into account and allowing volunteers to drive charters as desired."[3]

The court agrees that if all of the foregoing constituted undisputed facts, it would be sufficient to conclude that all of the shuttle drivers could reasonably have been expected to be called upon to drive in interstate commerce. However, the plaintiffs take issue with certain crucial facts that the defendants rely upon.

Initially, the defendants' evidence that the plaintiffs were informed that they could be required, if needed, to perform interstate driving consists mainly of bid sheets, signed by various of the plaintiffs. And indeed, the bid sheets submitted to the court by the defendants contained a clear statement that transportation of a commercial vehicle across state lines, including interstate charter duties, could be required at any time. However, the plaintiffs have submitted to the court other bid sheets, also signed by certain of the plaintiffs, which do not contain any language about the driver being required to drive interstate trips. Moreover, the plaintiffs point out that John McCue, the director of operations at FES since 2004, admitted that the statement in the bid sheet about interstate driving had not always been present on FES bid sheets. Beyond recalling that the language was added after 2003, McCue was unsure of the exact date it was added. He stated that it was "possible" that the language could have been added closer to 2010 than to 2003. In light of

---

[3] The defendants also point to the following facts as supportive of their argument that the plaintiffs reasonably could have been expected to drive in interstate commerce: that the plaintiffs "hail from both Indiana and Kentucky" and that the plaintiffs were required to cross into Indiana to do such things as "attend employee meetings and drop off and pick up critical employment documents, such as their paycheck, time card, and driver log books." The court is not convinced that those facts have anything to do with whether the plaintiffs are subject to the jurisdiction of the Secretary of Transportation. The question is not simply whether the plaintiffs ever, or even often, crossed state lines; it is whether they did so while transporting persons or property in interstate commerce. Crossing from Indiana to Kentucky to go to work at the Worldport and going from Kentucky to Indiana to pick up paychecks are not the sort of commercial interstate driving that renders a person subject to the jurisdiction of the Secretary of Transportation.

the evidence to which the plaintiffs point, the court cannot conclude that FES informed all of the shuttle drivers upon their hiring or at some other point during their employment as to the possibility of driving interstate charters as part of the ordinary course of their work.

The plaintiffs also take issue with the defendants' contention that FES indiscriminately assigned interstate trips. The plaintiffs contend that any non-shuttle driving on their part, such as driving interstate charters, was undertaken pursuant to volunteer opportunities that the plaintiffs were not required to accept. Viewing the record in the light most favorable to the plaintiffs, the court agrees that the evidence is insufficient to conclude as a matter of law that the plaintiffs' non-shuttle interstate driving was a regular part of their duties.

While the defendants correctly note that the fact that an employer elected to consider driver preferences in assigning routes does not necessarily mean that the employee drivers could not have reasonably been expected to drive in interstate commerce, *see, e.g.*, *Chao v. First Class Coach Co., Inc.*, 214 F. Supp. 2d 1263, 1275-1276 (M.D.Fla. 2001), the evidence in this case is not otherwise so conclusive as to whether interstate charter driving was a regular part of the shuttle drivers' duties so as to allow for a grant of summary judgment to the defendants. First, of the fourteen remaining plaintiffs, three never drove in interstate commerce at all. Nearly all of the plaintiffs who did drive in interstate commerce did so only one time during their employment. Specifically, Stephen Cates testified that he drove an empty passenger bus at one time; Chelsea Pellman served one time as a "hostess" on a charter; Agustin Rodriguez once drove passengers around Louisville in a van that had been brought to Louisville from FES's Indiana headquarters and was returned there afterwards;[4] Danny Williams once drove a charter

---

[4] A DOT notice of regulatory guidance concluded that the transportation of cargo or
continue...

bus from FES headquarters to Louisville, where he transported passengers before returning the empty bus to FES headquarters; David Ubelhart "may have" driven a shuttle tram from the Worldport to FES headquarters in Indiana for maintenance;[5] Quinn Gilbert drove a shuttle maintenance trip approximately five times during his six years working for FES, as well as once driving an empty charter bus from FES headquarters to a hotel in Louisville; Kevin Spears drove a shuttle maintenance trip three times; and Ryan Wentworth drove a shuttle maintenance trip once. Thus, nine of the fourteen plaintiffs either did not drive in interstate commerce or did so only once, a tenth plaintiff drove in interstate commerce a mere three times, and an eleventh drove in interstate commerce just six times during his six years of employment.[6]

---

[4]...continue
passengers within a state by a vehicle that was dispatched from an adjoining state constitutes interstate commerce. Regulatory Guidance for the Federal Motor Carrier Safety Regulations, 62 Fed. Reg. 16,406, (Guidance for § 390.3, Question 13).

[5] The plaintiffs contend that the driving of empty trams across state lines for repair is insufficient to render them subject to the MCA exemption because they were not carrying "passengers, property, or both," as required by 49 U.S.C. § 13501. However, a DOT notice of regulatory guidance states that transporting an empty commercial motor vehicle across state lines for repair and maintenance is considered interstate commerce. Regulatory Guidance for the Federal Motor Carrier Safety Regulations, 62 Fed. Reg. 16,406, (Guidance for § 390.5, Question 6). The guidance states that the property in such a situation is the empty commercial motor vehicle. *Id.*

[6] The remaining three plaintiffs drove in interstate commerce more often. Two of those three–Paul Finney and Ruel Minyard–served for some time as a "lead" shuttle driver, a position that is apparently distinct from other shuttle drivers and which requires the daily transport of shuttle trams for maintenance between the Worldport and FES's Indiana headquarters. Thus, as lead drivers, driving in interstate commerce was apparently a part of their regular duties. In addition, Minyard and plaintiff Norma Sherrell drove more regular charter trips, many of which were in interstate commerce. Minyard stated that he drove motorcoaches once or twice a month for a few years, but ultimately requested not to drive such charter routes anymore and FES honored that request. Sherrell testified in her deposition that she drove charters once or twice out of every three months, some of which were purely within Indiana and others of which she drove across state lines. Despite Minyard and Sherrell's more frequent driving of charters, the court is not convinced that the evidence is sufficient to show that driving an interstate charter was part of the regular duties of the shuttle drivers collectively.

The other evidence to which the defendants point is not enough to convince the court that the plaintiffs reasonably could have been expected to drive in interstate commerce as a part of their regular duties. For instance, the fact that FES provided training for the plaintiffs who did not yet have a CDL to obtain one certainly constitutes evidence in the defendants' favor on the issue. But, as the plaintiffs point out, FES seemed to lack urgency about ensuring that the plaintiffs had their CDL: one plaintiff never received a CDL, another plaintiff took over two years to get a CDL, and many others took several months. FES's unhurried nature in that regard suggests that driving routes requiring a CDL was not necessarily a part of the shuttle drivers' regular duties.

Additionally, while the defendants point out that they had the plaintiffs comply with the FMCSRs and that the defendants' main business involved interstate charters, of which the shuttle business was simply an "offshoot," the court still finds the evidence insufficient to meet the defendants' burden of showing that the Motor Carrier Act exemption applies to them. Simply put, in light of the lack of notice to the plaintiff shuttle drivers that they could be required to drive in interstate commerce as part of their regular shuttle duties and the generally minimal and irregular nature of the plaintiffs' interstate commerce driving, the record does not conclusively show that interstate driving was a "natural, integral, and . . . inseparable part of" the shuttle service. *See Morris*, 332 U.S. at 433.

The defendants cite cases in which a court found that the undisputed facts were sufficient to show that plaintiffs who drove mostly intrastate routes were nonetheless subject to the jurisdiction of the Secretary of Transportation because the plaintiffs were of a class of employee which could reasonably have been expected to drive in interstate commerce. *See Songer v.*

*Dillon Res.*, 618 F.3d 467 (5th Cir. 2010); *Chao v. First Class Coach Co.*, 214 F. Supp. 2d 1263; *Garcia v. Pace Suburban Bus Serv.*, 955 F. Supp. 75 (N.D.Ill. 1996); *Little v. Groome Tranp. of Georgia*, 2008 WL 4280362 (N.D.Ga. Sept. 15, 2008). However, each of those cases contain undisputed facts that are not present here.

First, in all of those cases, there was undisputed evidence that the companies had informed all of their drivers upon hiring that they could be subject to making out-of-state trips. *Songer*, 618 F.3d at 475 (several drivers testified that they understood when they were hired that they might have to drive out of state); *Garcia*, 955 F. Supp. at 77 (plaintiff who drove municipal bus route signed a form when he was hired acknowledging that he may be asked to assist the charter department); *Chao*, 214 F. Supp. 2d at 1275 (drivers, "at the time they [we]re hired," orally agreed that they would be "expected to be able and available to drive all routes offered by the company"); *Little*, 2008 WL 4280362, at *1 (drivers were advised "upon employment" that they could be called upon to drive any company route). Here, as noted above, the record shows only that, at some unknown point between 2003 and 2010, FES began adding language to the bid sheets stating that the shuttle drivers may be subject to driving interstate trips.

Additionally, in the cases cited by the defendants, the evidence that the companies actually expected all of their drivers to drive interstate routes was much stronger than the evidence before the court here. In *Songer*, the drivers had no dedicated routes, and the company's routes, whether within the state or out-of-state, were assigned "indiscriminately" via a dispatcher. 618 F.3d at 475. Here, the shuttle drivers drove dedicated routes and the evidence is less than unequivocal that FES assigned charter routes to the shuttle drivers in any manner that could be described as indiscriminately. And in *Garcia*, the evidence showed that drivers of

- 14 -

intrastate routes had been "pulled off" those routes to drive interstate charter and shuttle routes. 955 F. Supp. at 77. Moreover, the company in *Garcia* ran "airport emergency services," which constituted interstate driving, and which was staffed by any driver who was available, including those that regularly drove the plaintiff's intrastate route. *Id.* As compared to *Garcia*, there is no evidence here that it was typical for shuttle drivers to actually be "pulled off" of their shuttle routes to drive interstate routes. Nor does the evidence reflect that the defendants' operations included the sort of interstate emergency driving that would require the use of any available driver, no matter the driver's typical route. Moreover, in *Chao*, unlike here, the evidence clearly demonstrated that it was a typical part of each employees job to drive varying routes, including the interstate commerce routes. 214 F. Supp. 2d at 1275 ("[M]ost drivers rotate the types of routes they drive."). Finally, in *Little*, the principal issue in the case concerned whether the types of routes that the company typically ran–transporting delayed baggage for airlines to their passengers, providing ground transportation for passengers who suffered flight delays, and shipping packages to other states–constituted interstate commerce. 2008 WL 4280362, at *1-*2, *8. After determining that those routes indeed constituted driving in interstate commerce, the court had no trouble finding that the company's drivers, "who were advised that they could be called upon to do any company route, clearly took routes that involved practical continuous interstate travel." *Id.* at *9.

In contrast to the cases cited by the defendants, the court finds *Walters v. American Coach Lines of Miami, Inc.*, 569 F. Supp. 2d 1270, 1280-1284 (S.D.Fla. 2008), more analogous to the facts here. In that case, the defendant was a motor carrier that provided out-of-state passenger transportation; in-state transport between seaports, airports, and hotels; and a shuttle

service at local universities. 569 F. Supp. 2d at 1279. The university drivers were sometimes "asked to do general charter work," including interstate work. *Id.* In that respect, the shuttle supervisor would get a call from someone asking him to find shuttle drivers that would be willing to drive a weekend charter, and the supervisor would then ask around to see if somebody wanted to do the work. *Id.* The court found that there was a genuine issue of material fact as to whether the drivers could reasonably be expected to drive in interstate commerce. *Id.* at 1294. The court noted that the plaintiffs submitted evidence that "although the University shuttle bus drivers may be asked to do general charter work, they [we]re not required to perform these assignments and [we]re free to turn them down." *Id.* The court also found that the record was "unclear with respect to whether some or all of the University shuttle bus drivers signed either of the hiring standards forms," *id.*, which stated that the company's drivers were required to be willing and able to drive interstate routes. *Id.* at 1278-1279. As in *Walters*, the court here believes the record sufficiently unclear as to whether the shuttle drivers were required to drive in interstate commerce, as well as whether and when they were informed of any such requirement, so as to render summary judgment inappropriate.

## 2. The Practical Continuity of Movement in Interstate Commerce Test

The defendants alternatively argue that the plaintiffs drove in interstate commerce because the UPS Worldport shuttle routes were a part of a "practical continuity of movement" in interstate commerce. In particular, the defendants argue that the Worldport shuttles were part of interstate commerce for two groups of people: 1) UPS employees who lived in Indiana and worked at the Worldport in Kentucky; and 2) UPS airline personnel who traveled from the Worldport to other states or countries.

"Purely intrastate transportation can constitute part of interstate commerce if it is part of a 'continuous stream of interstate travel.'" *Walters v. Am. Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1229 (11th Cir. 2009). "For this to be the case, there must be a 'practical continuity of movement' between the intrastate segment and the overall interstate flow." *Id.* (quoting *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943)).

A review of decisions by the Supreme Court and federal appellate courts illuminates the application of this principle. In *United States v. Yellow Cab Company*, 332 U.S. 218 (1947), the Supreme Court examined whether cab companies were engaged in the transport of interstate travelers. The cabs transported many persons and their luggage to and from railroad stations in Chicago, where they were either going or returning from interstate trips. *Yellow Cab*, 332 U.S. at 230. However, in doing so, the cabs did not cross any state lines, did not limit their service only to railroad passengers, did not have any contractual arrangements with the railroads, and the cabs' fares were unconnected to the railroad fares. *Id.* at 230-231. The Court, holding that "interstate commerce is an intensely practical concept drawn from the normal and accepted course of business," found that the cab service was not a part of interstate commerce. *Id.* at 230-231. It stated:

> [T]he common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in the city of destination. What happens prior or subsequent to that rail journey, at least in the absence of some special arrangement, is not a constituent part of the interstate movement. The traveler has complete freedom to arrive at or leave the station by taxicab, trolley, bus, subway, elevated train, private automobile, his own two legs, or various other means of conveyance. Taxicab service is thus but one of many that may be used.

*Id.* at 231-232.

- 17 -

By contrast, in *United States v. Capital Transit Company*, 338 U.S. 286 (1949), the Supreme Court found that certain local District of Columbia bus and streetcar routes were subject to regulation by the Interstate Commerce Commission. The bus route in issue took passengers from the suburbs within the District to the central business area. *Capital Transit*, 338 U.S. at 288-290. There, "thousands of Government employees" transferred to a bus, operated by a different company, which took those passengers to their workplaces in Virginia. *Id.* The Supreme Court found that the "intra-District streetcar and bus transportation of passengers going to and from the Virginia establishments is an integral part of an interstate movement." *Id.* at 290.

Relying on *Capital Transit*, the Fifth Circuit, in *Marshall v. Victoria Transp. Co., Inc.*, 603 F.2d 1122 (5th Cir. 1979), found that purely intrastate bus services run by two companies in Brownsville, Texas were engaged in interstate commerce. *Marshall*, 603 F.2d at 1123-1125. Although the bus routes were solely within Brownsville, the routes ran near a bridge between Texas and Mexico. *Id.* at 1124. Nearly 19% of paying passengers on one company's routes either began or ended their journeys in Mexico, while the comparable figure for the other company was slightly over 14%. *Id.* The Fifth Circuit held that "although defendants' employees do not cross into Mexico, a substantial, regular and recurring part of their work consists of transporting persons that are making international journeys." *Id.* The Fifth Circuit concluded, "Because their work was entwined with a continuous stream of international travel, [the defendants] were engaged in commerce within the meaning of the [FLSA]." *Id.* at 1125.

In *Abel v. Southern Shuttle Servs., Inc.*, 631 F.3d 1210 (11th Cir. 2011), the Eleventh Circuit examined a "shared-ride airport shuttle" that transported passengers to and from three South Florida airports. *Abel*, 631 F.3d at 1211. While some passengers arranged for shuttle

transportation by directly contacting Southern Shuttle, a "large portion" of the reservations made with Southern Shuttle were made through internet package deals  that included airfare and hotel accommodations along with transportation to and from the airport. *Id.* at 1212. The Eleventh Circuit found that "the purely intrastate transport of passengers to and from an airport may, *under certain circumstances*, constitute interstate commerce and thus bring the transportation company within the jurisdiction of the Secretary of Transportation." *Id.* at 1216. Noting that "[m]any of Southern Shuttle's passengers to and from the airport have either just flown from, or are about to fly to, places outside the state of Florida," and that, "[a] large portion of Southern Shuttle's reservations are made via travel websites on the internet" as part of "package deals," the Eleventh Circuit found that the circumstances that would render the intrastate transport of passengers subject to the jurisdiction of the Secretary of Transportation were present. *Id.* at 1216-1217.

Applying the principles illuminated in the cases discussed above, it is conceivable that the Worldport shuttle did constitute interstate commerce as part of a practical continuity of movement. But the evidence submitted by the defendants is insufficient for this court to so conclude. Simply put, that evidence amounts to the following items. First, Ed Moore, the former contract supervisor for FES's shuttle service, averred in an affidavit that "UPS employs thousands of employees at the Worldport, including residents of both Kentucky and Indiana. Additionally, pilots and other UPS vendors and personnel residing in other states and nations circulate in and around the Worldport before flying to locations around the world." Moore further averred that the shuttle service ran on a "two-mile loop between controlled access security checkpoints next to UPS employee parking areas and other designated stops within the

Worldport. From time to time, UPS also required FES to . . . take UPS employees from the Worldport to a controlled access point at the Worldport's air freight terminal." And, William Waggoner, FES's vice-president and CFO, averred in an affidavit that "[t]he drivers who drive the UPS route pick up and transport employees coming from Kentucky and Indiana, among other locations. There is even public transportation for Indiana employees to the UPS facility where Free Enterprise completes the shuttle service."

While the defendants' evidence undoubtedly allows the court to conclude that persons who lived in Indiana and persons who were going to travel to out-of-state destinations rode the Worldport shuttle, the court cannot say from the record before it that it is clear that the shuttles were part of a "practical continuity of movement" in interstate commerce. The decisions in *Capital Transit*, *Marshall*, and *Abel* finding that purely intrastate transportation constituted interstate commerce were premised in large part on the substantial connection between the intrastate portion of the transit and the out-of-state trip. *See Capital Transit*, 338 U.S. at 288-90 (bus and streetcar routes were part of the "daily stream of Government workers from the District to Virginia and back again"); *Marshall*, 603 F.2d at 1124 (over 14% of customers on both intrastate bus routes originated or terminated their journeys in Mexico); *Abel*, 631 F.3d at 1216 ("[m]any" passengers of the shuttle company had flown from or were about to fly to out-of-state locations, and a "large portion" of shuttle reservations were made via travel websites).

The evidence submitted by the defendants is inadequate for this court to conclude that the shuttle service had such a large and direct connection to interstate commerce. The defendants point to no evidence concerning the numbers of persons for whom the shuttle service constituted a part of an interstate trip, either in absolute terms or as a percentage of total riders. Recalling

that it is the defendants' burden to establish their exemption from the FLSA, simply stating that people that were about to board an airplane, or that lived in Indiana, rode the shuttles along with the thousands of UPS employees who were Kentucky residents and were not coming from or going to an out-of-state destination, is insufficient to meet that burden.

**B. The Air Carrier Exemption**

Defendants also urge that the shuttle drivers were exempt from the overtime pay provision of the FLSA pursuant to the exemption in that statute for "any employee of a carrier by air" that is subject to the Railway Labor Act ("RLA"). 29 U.S.C. § 213(b)(3). The RLA defines a "carrier" as any railroad or air carrier "subject to the jurisdiction of the Surface Transportation Board . . . and any company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad [or air] and which operates any equipment or facilities or performs any service (other than trucking service) in connection with the transportation, receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, and handling of property transported by railroad, and any receiver, trustee, or other individual or body, judicial or otherwise, when in the possession of the business of any such 'carrier.'" 45 U.S.C. § 151; 45 U.S.C. § 182 (applying almost all provisions of RLA, including 45 U.S.C. § 151, to carriers by air and their employees).

Accordingly, "in the air carrier context, the affiliate prong of the § 151 definition results in RLA coverage for carrier affiliates that do not fly aircraft for the transportation of freight or passengers if their functions are nevertheless related to air transportation." *Thibodeaux v. Executive Jet Int'l, Inc.*, 328 F.3d 742, 752 (5th Cir. 2003). The reasons for the expansive definition of carrier are "(1) to avoid the possibility that certain employees could interrupt

commerce with a strike, and (2) to prevent a carrier covered by the RLA from evading the purposes of the Act by spinning off components of its operation into subsidiaries or related companies." *Verrett v. SABRE Group, Inc.*, 70 F. Supp. 2d 1277, 1281 (N.D.Okla. 1999).

In order to determine whether a company that is not itself engaged in the common carriage of freight or passengers by rail or air nonetheless constitutes a "carrier" under the statute, courts and the National Mediation Board ("NMB") use a two-prong test. *See Cunningham v. Elec. Data Sys. Corp.*, 579 F. Supp. 2d 538, 541 (2008).[7] First, under the "control" prong, the court examines whether the company was under the ownership or control of a carrier. *Id.*; *Verrett*, 70 F. Supp. 2d at 1281-1282. Second, under the "function" prong, the court examines whether the company provided transportation related services. *Cunningham*, 579 F. Supp. 2d at 541; *Verrett*, 70 F. Supp. 2d at 1281-1283.

According to the defendants, FES constituted a "carrier by air" under the RLA by virtue of its control by UPS. As to the control prong, the defendants state that UPS determined nearly every aspect of the shuttle schedule; UPS mandated that FES and its drivers meet various maintenance, insurance, safety, and security requirements; UPS required FES to submit weekly, quarterly, and annual reports; UPS set performance standards for FES; UPS dictated the terms of FES's training of the shuttle drivers; UPS dictated background check procedures for new hires; and UPS had the ability to "effectively discipline" an FES driver by withdrawing his or her security privileges. The defendants also argue that the function prong was met because the FES shuttle operations were of the type that would traditionally be performed by air carrier employees.

---

[7] The NMB is a federal agency that is charged with labor-management relations under the RLA. *Cunningham*, 579 F. Supp. 2d at 541 n.2.

As support for their argument, the defendants cite *Air Serv Corporation*, 35 N.M.B. 201 (2008). Air Serv was a company that contracted with FedEx to provide "shuttle bus transportation for FedEx employees between FedEx parking areas and designated points at FedEx's Memphis Hub Complex." *Air Serv*, 35 N.M.B. at 203. The shuttles took "FedEx pilots to and from the aircraft and t[oo]k[] other FedEx employees to and from the Hub where they sort packages and load and unload aircraft." *Id.* The shuttle service had been performed by FedEx employees prior to being subcontracted; FedEx continued to use some of its own employees for shuttle driving. *Id.* The NMB ultimately found that both prongs of the affiliate carrier test were met as to AirServ, rending its operations and its employees at the Memphis Hub subject to the RLA. *Id.* at 210-212. Likening the shuttle service at the Worldport to AirServ's at the FedEx Hub, the defendants argue that FES's operations and employees at the Worldport were subject to the RLA, and thus exempt from the FLSA's overtime provisions.

However, as the plaintiffs point out, FES contracted to provide the shuttle service with United Parcel Service, Inc. ("UPS, Inc."). UPS, Inc. has a sister company named United Parcel Service Company ("UPS Co."). In a 1996 case, the District of Columbia Circuit Court of Appeals explained the distinction between UPS, Inc. and UPS Co. *United Parcel Serv., Inc. v. N.L.R.B.*, 92 F.3d 1221, 1223 (D.C. Cir. 1996). In particular, that Court noted that UPS, Inc. performed "the traditional truck-delivery service" of UPS while UPS Co., a newer corporation, transported "all the air freight." *Id.*

The difficulty with the defendants' argument is that, while there is no dispute that UPS Co. is an air carrier under the RLA, UPS, Inc., with whom FES contracted, has been found not to be an air carrier under the RLA. *Quantem Aviation Servs.*, 37 N.M.B. 209, 210, 224 (2010). The

NMB's decision in *Quantem Aviation* is instructive on the question of whether FES was an air carrier under the RLA. Quantem Aviation contracted with UPS, Inc. to load and unload UPS aircraft at a Clearwater, Florida airport. *Id.* at 212. The contract specifically identified the purpose of the agreement as being for Quantem Aviation "to provide the ground handling operations associated with its Aircraft Operators and UPS's air cargo business." *Id.* The NMB had little trouble finding that the Quantem employees fulfilled the function prong of the RLA carrier test. *Id.* at 222. Nevertheless, the NMB found that Quantem and its employees were not subject to the RLA. *Id.* at 225. In that regard, while Quantem Aviation was clearly subject to a significant degree of control by UPS, Inc., any control over Quantem by UPS Co. was "done indirectly through UPS, Inc." *Id.* at 224. The NMB noted that, generally speaking, indirect control by an air carrier through an intermediate company would be sufficient if the intermediate company was itself an air carrier. *Id.* However, Quantem Aviation presented an "anomalous case" because the intermediate company–UPS, Inc.–had been expressly determined not to be an air carrier. *Id.* The NMB stated that it would "not assert jurisdiction where the entity, UPS, Inc., exerting direct control over an employer in question is not itself deemed an RLA carrier based on putative control of that entity by an RLA carrier, UPS Co." *Id.* Explaining its reasoning for so finding, the NMB pointed out that it would be an anomaly for the work done by Quantem's employees to be subject to the RLA when performed by Quantem's employees, but not subject to the RLA if performed by the employees of UPS, Inc., with whom Quantem had the contract. *Id.*

As with Quantem Aviation, there is little doubt that FES was subject to significant direct control by UPS, Inc. As noted above, the contract for the shuttle service was between FES and

UPS, Inc., and the contractual requirements for FES and its employees ran to UPS, Inc. The

defendants do not even seem to dispute that UPS, Inc. had some amount of significant control

over FES through that contractual arrangement. Instead, the defendants attempt to distinguish

*Quantem Aviation* by arguing that UPS Co. "shared direct control" with UPS, Inc. over FES's

shuttle service. However, the "critical facts" that FES claims distinguish this case from *Quantem*

*Aviation* are less than compelling.

First, the defendants note that the Worldport had more UPS Co. air traffic than the

Clearwater airport in *Quantem*. While that may be true, it shows nothing about the level of actual

control by UPS Co. over FES's shuttle operations. Similarly, while the defendants state that the

request for proposal for the contract identified the requirements as those of UPS Co. and that, in

negotiating the contracts, FES dealt with persons in UPS's "Air District Finance" office, the

contract itself explicitly states that it was between UPS, Inc. and FES. Thus, no matter who

negotiated the contract, the provisions within it related to FES's obligations to UPS, Inc., not to

UPS Co. The defendants further note that FES leased at least one vehicle from UPS Co. But

leasing a vehicle from a company is different than being under the control of that company.

The defendants also point out that, at least at one point, they corresponded via email with

somebody from "UPS Airlines" about shuttle maintenance. Not only is there no confirmation in

the record that "UPS Airlines" was actually a part of UPS Co., rather than a division of UPS,

Inc., but a few emails concerning shuttle maintenance are insufficient to meet the defendants'

burden of proving that the Air Carrier exemption to the FLSA is applicable. Finally, the

defendants point out that many of FES's requirements under the contract with UPS, Inc. were

related to airport security. There is little doubt about that; however, there is little doubt that the

same was true in *Quantem Aviation*, where the subject company's employees were engaged in loading and unloading aircraft. Simply put, while FES may have had to meet certain aviation-related requirements to perform its shuttle operations, that does not mean that FES was under the control of UPS Co. rather than the company it actually contracted with, UPS, Inc.

In short, the court does not see any evidence in the record from which it would be sufficient to conclude that UPS Co. actually exercised direct control over FES. Without such evidence, there is no basis for concluding that the air carrier exemption to the FLSA applies to FES.

## IV.

While the court will deny the summary judgment motion of the defendants as to the plaintiffs' collective claims for failure to pay overtime wages under the FLSA and the Kentucky wage and hour laws, the court's review of the evidence relating to those claims has raised an issue of concern to the court. In April of 2011, this court conditionally granted the motion of the plaintiffs to provide court-supervised notice to putative collective action members. The basis for the court's order was that the named plaintiffs, Paul Finney and Chelsea Pellman, made a showing that the shuttle drivers were similarly situated.

However, the evidence reviewed by the court when it ruled upon the summary judgment motion raises the possibility that the shuttle drivers are not actually similarly situated. The record discloses that certain drivers, including Finney, were "lead" drivers, a function that included making interstate maintenance trips as part of the drivers' regular duties. The record also discloses that a number of drivers drove in interstate commerce at least once, whether or not it was a part of their regular duties. Actual driving in interstate commerce clearly renders a driver

exempt from the FLSA for a period of time. *See* 46 Fed. Reg. 37,903 ("Evidence of driving in interstate commerce . . . should be accepted as proof that the driver is [subject to the Motor Carrier Act exemption] for a 4-month period from the date of proof."). Thus, it appears to the court that the question of which employees were exempt from the FLSA, and for what periods of time, may need to be resolved on an employee-to-employee basis. However, having only heard the parties' arguments regarding the summary judgment motion and not on this particular issue, the court will not rule on it yet.

## V.

The defendants also contend that summary judgment should be granted as to the plaintiffs' claim pursuant to the Kentucky wage and hour laws that they were not paid at all for certain time that they worked. Specifically, the plaintiffs claim that they were not paid for the thirty-minute period preceding their run time for which FES directed them to arrive early. The defendants do not dispute that they told the plaintiffs not to record the pre-run period on their timesheets. Instead, the defendants have submitted an affidavit from William Waggoner, the vice-president and CFO of Sodrel Holding Company, of which FES and Sodrel are subsidiaries. Waggoner's affidavit explains that the shuttle drivers were allowed to take a thirty-minute unpaid meal break during their run time. Thus, the paid thirty-minute pre-run period and the unpaid thirty-minute meal period offset each other, and the total amount of compensable hours worked was the same as the run time. The defendants argue that by being paid for the entire run time, the shuttle drivers received compensation for all hours they actually worked.

In response, the plaintiffs argue that the defendants "conceded liability" by admitting that FES told the plaintiffs not to record the pre-run time on their time cards. In the plaintiffs' view, the question of whether or not the plaintiffs were compensated for unpaid meal breaks is a "damages issue." The court disagrees with that analysis. The plaintiffs's claim is that they did not receive wages for a one-half hour period that they worked each workday. The defendants submitted proof to the court, in the form of Waggoner's affidavit, that the plaintiffs received wages for the total amount of time they worked each day. Thus, the defendants' argument and proof goes directly to whether or not the defendants are liable to the plaintiffs for failure to pay certain wages.

Because the defendants have submitted evidence suggesting that the plaintiffs received wages for the total number of hours the plaintiffs worked each day, the plaintiffs must demonstrate to the court that there is a genuine issue of material fact requiring resolution at a trial. With respect to plaintiff Chelsea Pellman, the court finds that plaintiffs have pointed to evidence that is sufficient to create a genuine issue of material fact. Chelsea Pellman testified that she typically worked a shift called "lunch relief," in which she drove shuttles for other drivers who were taking their lunch break. When working lunch relief, Pellman did not generally get a lunch break herself. Pellman also testified that she was told not to record the half-hour pre-run time on her time card. The court finds that Pellman's testimony is sufficient to create a genuine issue of material fact as to whether she was paid wages for the total number of hours she worked each day.

The plaintiffs also point to testimony from plaintiff David Ubelhart, in which he was asked whether he only recorded the entire run time if he "actually worked during the entire run

time"; Ubelhart agreed with that statement. However, when asked whether he drove for the "entire run time," Ubelhart stated, "[o]ther than lunch, yes." And when he was later questioned whether he recalled if he included his lunch time on his time card, he stated that he could not recall. The court finds that Ubelhart's testimony is not sufficient to create a genuine issue of material fact as to his claim for unpaid wages. It is the burden of a plaintiff employee to establish that he performed compensable work for which he was not compensated. *See England v. Advance Stores Co., Inc.*, 263 F.R.D. 423, 450 (W.D.Ky. 2009). In light of the defendants' evidence that the plaintiffs were compensated for the amount of time they worked each day by including an unpaid lunch break in the compensable time to make up for the thirty-minute pre-run time that plaintiffs were instructed not to include on their time sheets, Ubelhart's inability to state that he did not include lunch time on his time sheets renders him unable to meet his burden.

As to the remaining 12 plaintiff shuttle drivers, the plaintiffs have not pointed to evidence that is sufficient to find any genuine issue of material fact necessitating a trial. In particular, the plaintiffs do not point to any evidence suggesting that any of those shuttle drivers either did not take an unpaid lunch break or took one but subtracted time for it on their time cards. Accordingly, the court will deny summary judgment as to Pellman's claim for unpaid wages, but will grant summary judgment as to the claims of all other plaintiffs for unpaid wages.

## VI.

The defendants next argue that, even if the court finds that summary judgment is inappropriate on the plaintiffs' claims, the court should grant partial summary judgment on the plaintiffs' request for liquidated damages. According to the defendants, the court should find that

liquidated damages are unavailable because they exercised good faith and had reasonable grounds for believing that they did not violate the FLSA or the Kentucky wage and hour laws.

Under the FLSA and the Kentucky wage and hour laws, liquidated damages are available if the plaintiff proves a failure to pay wages or to pay overtime wages. 29 U.S.C. § 260; KRS § 337.385. However, under both of those acts, if the employer demonstrates to the court that any violations were in good faith and were based upon reasonable grounds for believing that they were not violations, the court may, in its discretion, decline to award liquidated damages. 29 U.S.C. § 260; KRS § 337.385.

Although there has not yet been a finding of liability, and thus any final ruling on liquidated damages would be premature, the court is inclined to find that liquidated damages would be unavailable in this case. The factual determination of whether the shuttle drivers, many of whom actually drove in interstate commerce at one time or another, were subject to the Motor Carrier Act exemption to the FLSA is no easy task. The detailed analysis of the facts that the court engaged in above to find that the defendants were not entitled to summary judgment on the overtime pay claims aptly demonstrates the complexity of the factual analysis. Waggoner's affidavit explains that FES had become very familiar with DOT regulations and jursidiction during their decades-long experience in business, and had relied on that familiarity to conclude that the shuttle drivers had a reasonable expectation of driving in interstate commerce. Moreover, the defendants have pointed out that they were twice investigated by government agencies – in 2004 by the Kentucky Labor Cabinet and in 2007-2008 by the Department of Labor – but neither investigation resulted in a final finding that FES had violated the FLSA or the Kentucky wage and hour laws. Based on that evidence, the court would be inclined to find

that the defendants have met their burden of showing good faith and a reasonable basis for concluding that the shuttle drivers were not entitled to overtime wages, and would likely exercise its discretion to decline to award liquidated damages. However, the court will await any adjudication of liability prior to rendering a final finding as to the availability of liquidated damages in this case.

## VII.

Lastly, the defendants argue that Sodrel is entitled to summary judgment because Sodrel did not operate the shuttle and was not the plaintiffs' employer. The plaintiffs contend that summary judgment for Sodrel is inappropriate because the nature of the relationship between Sodrel and FES is unclear. The plaintiffs point out that most of the employment applications they filled out had Sodrel's name on it and that two plaintiffs had "Employee Information Update Sheets" with Sodrel's name atop them. They also note that McCue, the director of operations at FES, testified that while the shuttle drivers worked for FES they "may have done some work for Sodrel."

Summary judgment on the plaintiffs' claims against Sodrel is warranted. Although most of the plaintiffs filled out an employment application with Sodrel's name on it, there is no dispute that FES was both the operator of the shuttle service and the employer of the plaintiffs. That is true no matter how closely related Sodrel and FES were, whether or not Sodrel's name was atop a certain papers used by the companies, and whether the plaintiffs engaged in non-shuttle work for Sodrel. Because the plaintiffs claims all clearly relate to their work as shuttle drivers, which they performed for FES and not for Sodrel, the court will grant summary judgment on all claims against Sodrel.

**VIII.**

The court will grant summary judgment as to all claims against Sodrel. The court will also grant summary judgment as to the unpaid pre-run time wage claims against FES of all plaintiffs except Chelsea Pellman. The court will deny summary judgment as to the plaintiffs' overtime wage claims, as well as to Chelsea Pellman's unpaid pre-run time wage claim. A separate order will issue in accordance with this opinion.

November 8, 2012

**Charles R. Simpson III, Judge**
**United States District Court**

D03